**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**LENZZIE R. VANCE,**

      **Petitioner,**                               **CASE NO. 2:10-CV-00746**
                                                      **JUDGE MARBLEY**
      **v.**                                      **MAGISTRATE JUDGE KING**

**WARDEN, HOCKING CORRECTIONAL**
**FACILITY,**

      **Respondent.**

<u>**ORDER and**</u>
<u>**REPORT AND RECOMMENDATION**</u>

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the *Petition*, *see* Doc. No. 1, Respondent's *Return of Writ*, Doc. No. 15, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**  Petitioner's request for a stay of proceedings, Doc. No. 24, is **DENIED.**  His request for production of documents Doc. 25, is likewise **DENIED.**  Respondent's motion to strike the documents attached to Petitioner's *Reply,* Doc. No. 29, is **GRANTED.**

**FACTS and PROCEDURAL HISTORY**

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On December 21, 2004, appellant was charged by complaint with one count of rape, a felony of the first degree, based on an incident of abuse that allegedly occurred on February 14, 2004. On April 21, 2005, the Franklin County Grand Jury indicted appellant on five third-degree felony counts of gross sexual imposition, two fourth-degree felony counts of gross sexual imposition, three counts of rape and one count of tampering with evidence. These charges were based upon appellant's alleged sexual abuse of his stepdaughter between June 1997 and July 2004, and his alleged attempt to tamper

with evidence of that abuse.

All counts were tried to a jury beginning on July 10, 2006. On July 12, 2006, the trial court granted appellant's motion to dismiss two of the rape counts. On July 14, 2006, the jury found appellant guilty on all five third-degree felony counts of gross sexual imposition and on the count of tampering with evidence. The jury found him not guilty on the two fourth-degree felony counts of gross sexual imposition and on the one remaining rape count. On September 25, 2006, following a presentence investigation and a sentencing hearing, the court sentenced appellant to one three-year term of imprisonment for each of the six counts on which he was convicted, and ordered that he serve the terms consecutively, for an aggregate sentence of 18 years. The court also classified appellant as a sexual predator.

\*\*\*

Appellant is the stepfather of the victim, who was 17 years old at the time of trial. Appellant married the victim's mother when the victim was 18 months old.

The victim testified that when she was eight years old appellant asked her to lay down with him in her parents' bed when she was wearing only a T-shirt and underwear. She agreed to do so, whereupon appellant put her on top of him and, while holding her with both hands, moved her back and forth and up and down. This went on for 30 to 60 minutes. The victim testified that as she got older, appellant would make sexually suggestive jokes to her and she would often find him in her bedroom when she woke up in the morning.

She recalled that appellant has a tattoo of a rose on his right groin area. She stated that she was four or five years old the first time she saw the tattoo. Beginning when she was four or five years old appellant would engage in "play fighting" or wrestling with the victim. The victim would be wearing shorts and a T-shirt or sometimes only underwear and a T-shirt. She stated that appellant would either wear only shorts or would be completely naked. She stated, "he didn't wear a lot of clothes. * * * He liked to walk around the house naked a lot. I guess it made him feel more comfortable. I don't know." (Vol. I Tr. 42-43.) While the two would wrestle, appellant would touch the victim's bottom and breasts, sometimes over her clothing and sometimes underneath her clothing. This play-fighting and touching would occur regularly from the time the victim was four or five years old.

2

She stated that, as she got older, she began to wake up in the morning to find appellant touching her, and she would pretend that she was still asleep. She stated that appellant would insert his fingers into her vagina. She stated that she was frightened by this, but did not do anything about it because she did not want to make appellant angry. She explained that she did not want to make him angry because she did not like his temper. The victim explained that her parents had a history of fighting throughout her childhood, including fist fighting. Her mother had left appellant three times. The victim reported that she and appellant got into a fistfight with each other once. She further explained that she was afraid of appellant because he had more authority than she did.

The victim testified that when appellant would visit her bedroom early in the morning, in addition to touching her vagina, he would sometimes get on top of her and would kiss her from her breasts down to her vagina. She denied experiencing any penile penetration. She testified that she never actually saw appellant ejaculate, but on one occasion she could feel fluid and saw spots on the sheet afterwards. She stated that the touching began when she was eight years old and happened continuously until Franklin County Children Services ("FCCS") removed her from her home in February 2004. She recounted that the touching would occur early on weekend mornings, around 6 or 7 o'clock, while her mother slept in another bedroom.

The victim told the jury that once, when appellant was in bed with her and touching her vagina, her mother walked in and asked appellant what he was doing. "And he said, well, I'm waking up [the victim]. And she is like, well, why? And he was like, well, what are you doing in here? [The victim's mother] said that she had a bad dream. And he said that well, he would be in there in a minute and they could talk about it, and then he left my room and then he went in there." ( *Id.* at 48.) She stated that as she got older, the abuse went from being sporadic to occurring every weekend and being "more intense." ( *Id.* at 38.)

The victim testified that when she was 12 or 13 years old appellant got into the shower with her but did not touch her at that time. He would also sometimes touch her chest or bottom while making sexual jokes, and he would tease the victim's mother about the victim's breasts being larger than her mother's.

3

The last time that appellant touched her inappropriately was on a weekend in February 2004 when she awoke to find appellant digitally penetrating her vagina. Later, she told a friend about the touching and also related how her parents fought and "how controlling I thought my stepdad was." ( *Id.* at 36.) Her friend related this information to a school counselor, who called FCCS. FCCS took her into custody and a criminal investigation ensued.

The victim kept several diaries, which she identified as State's Exhibits 1 through 5. She testified that she had written in Exhibit 5 about being sexually abused by appellant, but that those pages are now missing. She kept Exhibit 5 in a drawer in her desk, located in her bedroom.

On cross-examination, the victim admitted that she had complained about appellant enforcing rules and controlling her. She further admitted that, on one occasion when she was fighting with her mother and appellant, she threatened to call the police and said that the police would remove her from her home.

She admitted that she had opportunities, before February 2004, to tell someone about appellant's abuse. She had had her own cellular telephone for several years and she and her mother had stayed with her maternal grandmother or her mother's sister each time her mother left appellant. On direct examination she explained that she did not tell her grandparents about the abuse because "I was more worried about how my mother felt because she was devastated from being away from [appellant]. I wasn't really thinking about myself at the time and how I felt." ( *Id.* at 39-40.) When asked why she had not told her aunt about the abuse, she explained, "[b]ecause we were away from [appellant]. So I didn't need to." ( *Id.* at 40.)

When asked, on direct examination, why she had not confided in anyone else before February 2004, she answered, "I, first of all, didn't know how to. And I didn't want to make him mad. And I wanted to keep what family I knew together." ( *Id*. at 37.) She explained that she did not have a good relationship with her grandparents and she never knew her biological father or his family. Consequently, appellant "was the only father figure, and [her mother was the] only mother that I had. And to me, that is what I wanted. I had nobody else to go to. And at the time I trusted [appellant] most of all, and I didn't want to lose that at the time." ( *Id*. at 37-38.) Counsel went on to inquire, "[y]ou said that you trusted him most of all. Even though your stepfather was abusing you at this time, you still trusted him?"

4

( *Id.* at 38.) The victim replied in the affirmative, explaining, "[b]ecause I have known him since I was very little. Like I said, he was the only father figure to me." ( *Id.*)

When asked why she had not told any of her teachers about the abuse, she stated: "I didn't really think about it because, like I said, I felt the most comfort there because, you know, I trusted [appellant]. And, you know, we had the closer relationship. I never even had the relationship with my mother that much. So I was just more worried about making him mad, disappointing him." ( *Id.* at 40-41.) When asked about her relationship with her mother the victim stated she "didn't feel close to her." ( *Id.* at 41.) She explained that appellant "was the only one that I had a relationship with that I was close with." ( *Id.* at 90.) She testified that whenever there was an argument, her mother always took appellant's side. The victim testified that her mother chose to continue to live with appellant, up to and during appellant's trial, so the victim remained in foster care.

Detective Russell Moore, of the Westerville Police Department, testified as to the steps taken in the investigation of the victim's allegations. He stated that he conducted a consensual search of appellant's home on the night of the victim's initial disclosure. The purpose of this initial search was to obtain DNA samples from appellant and from any object in the victim's room that contained bodily fluid, as revealed through the use of an alternative light source.

The detective executed a search warrant several months later. The scope of the warrant included the victim's diaries, based on the descriptions thereof that the victim had given police. However, when police executed the warrant, the diaries were not present. Detective Moore stated that when police arrived they found that the contents of the victim's room had been gathered up and placed in cardboard boxes and plastic containers stored in the room. At trial, the parties stipulated that appellant obtained possession of the diaries at some point in time and gave them to a third party, who later turned them over to police. Detective Moore then met with the victim to review and discuss the diaries.

Social worker Sha Clark ("Clark") testified next. She is employed at Columbus Children's Hospital and works in that facility's Child and Family Advocacy Center. She testified that she conducts interviews with children who are alleged victims of abuse "to gather information regarding the allegations, to ensure [the children] receive the most

5

appropriate medical evaluation, so the history that I gather I provide to the physicians so they can complete their medical evaluation." (*Id.* at 177.) She told the jury that, after establishing a rapport with the interviewee through general questioning, she tells the child that the interview is for medical evaluation purposes, and that the information they provide to her will be shared with the physicians conducting the evaluation.

The victim described for Clark the incidents of abuse, and Clark's testimony in this regard was consistent with the victim's trial testimony. Clark added that the victim told her that the digital penetration was substantial enough that it caused the victim pain. According to Clark, the victim also related that when the victim would walk by appellant, he would put his hands underneath her clothing and rub her breasts, stomach or genitals. The victim also told her about appellant frequently walking around the house wearing no clothing. The victim also related inappropriate sexual talk, including one incident in which appellant told the victim that he correlated her sucking her thumb when she was a baby to her sucking on his penis. The victim also told Clark about her and appellant play-fighting and how it sometimes occurred when neither of them was wearing clothes. During the play-fighting, the victim told Clark, appellant would touch the victim's breasts and genitals and sometimes he would have an erection.

She told Clark that she used to shower late in the evening, but that appellant asked her to start showering earlier, as early as after school. He would sometimes go into the bathroom while she was showering and would either sit in the bathroom and talk to her or would join her in the shower. She told Clark that she had not told her mother because the two were not close and she did not feel that her mother would believe her. She reported that her mother was home during much of the abuse and had witnessed the play-fighting and incidents of appellant putting his hands underneath her clothing.

Gail Horner ("Horner") testified next. She is a pediatric nurse practitioner at Columbus Children's Hospital's Center for Child and Family Advocacy and at that hospital's emergency room. Horner was qualified as an expert in the area of child sexual abuse and trauma examinations. Horner performed a physical examination of the victim on the same day in 2004 that Clark interviewed the victim. Horner testified that the physical examination was normal and there was no evidence of trauma to the genitalia, although, according to Horner, only five percent of the children she examines have evidence of such

trauma. She testified that digital penetration of the vagina would not necessarily have torn the victim's hymen because the hymen had been "estrogenized," or elasticized through the effects of puberty-related hormones, making it less susceptible to tearing. Therefore, she opined, the digital penetration that the victim reported could have occurred without leaving any sign of trauma or other objective physical findings.

A forensic scientist with the Ohio Bureau of Criminal Identification and Investigation testified that forensic tests of various items of the victim's bedding were negative for the presence of semen.

The state's final witness was appellant's wife and the victim's mother ("D.V."). She married appellant in 1989. She testified that she consented to a search of the victim's room on the date the victim disclosed to police appellant's sexual abuse. She stated that when the police left that day they did not indicate to her that they would be back for any additional searches.

She explained that she and appellant found the victim's diaries while searching the victim's room one day in March 2004, after the first police search of the home and after the victim had been removed to foster care. D.V. testified that one of the journals contained a page in which the victim wrote about appellant "touching her inappropriately early in the morning * * * in her private parts." (Vol. II Tr. 38.) When appellant read that "[h]e became angry at that point and tore out the page and ripped it up. And he ended up putting it in the trash. And at that point there were other journals that we didn't look through because we were just - we were - it was just too emotional. We were just too upset." ( *Id*.) Eventually, the two did read the remaining diaries. D.V. identified State's Exhibits 1 through 5 as the diaries that they found, and identified State's Exhibit 5 as the diary from which appellant had ripped a page.

D.V. further testified that police executed a search warrant at her home on April 9, 2004. She told the jury that, while police searched the residence, she placed a cellular telephone call to a third party to whom she and appellant had given the victim's diaries. Per the third party's instructions, she did not tell police that day about the location of the diaries. Eventually, the third party turned the diaries over to police.

D.V. verified that, one weekend morning within the time frame of October 2003 through January 2004, she found appellant in the

victim's bed. The time was between the hours of 5:30 and 7:30 a.m. She testified that when she saw appellant laying in the victim's bed she could not discern whether he was wearing any clothes. However, she later testified that appellant's practice is to sleep naked. She recounted no conversation taking place between her and appellant while appellant was in the victim's bed. Rather, she stated that, upon seeing him in her daughter's bed, she simply went back to her own bed. When appellant returned to the couple's bedroom, she asked him where he had been, and he told her that he had been in the victim's room "snuggling with her." ( *Id*. at 42.)

She told the jury that she did not think that appellant being in the victim's bedroom at that time was odd or unusual. She stated that she was not concerned because "no one appeared to be awake." ( *Id.* at 43.) However, after she was shown a videotape of her interview with Westerville police, she conceded that she had told the detective that she had thought it was odd that appellant was in the victim's bed so early in the morning. She stated that appellant would frequently lay with the victim while the two played Playstation, but that would occur at 8:30 or 9:00 a.m., but never as early as it was on the morning she found appellant "snuggling" with the victim.

She confirmed that appellant began play-fighting with the victim when the victim was very young. She stated that when the victim got older, appellant would say "we are getting too old to be doing this kind of, you know, hitting each other like this. * * * [H]e said, I would sometimes accidentally hit your tits. And [the victim] would say[,] so. You know, I like doing this." ( *Id*. at 47-48.) D.V. confirmed that appellant and the victim would sometimes be partially naked while they were play-fighting. She stated, "I don't remember a time when they were both naked together, just various combinations." (*Id.* at 49.) There were times, according to D.V., that either the victim or appellant would be completely naked. ( *Id.*)

She stated that both appellant and the victim participated in and initiated the play-fighting. She recounted times when the victim would pick the lock to the couple's bedroom door until they finally changed the lock.

D.V. testified that appellant was usually naked anytime he was in the couple's home. She stated that this was appellant's practice before the two lived together and he continued to be naked while at home up to the time of trial, even though the victim no longer resided there. She explained that appellant suffered from persistent groin pain that was

8

so intense it would bring him to tears and necessitated, in 2000, surgical removal of one of his testicles. Following that surgery he consulted a pain clinic because his pain had worsened. There he was diagnosed with neuroma and irreversible nerve damage.

Since 2000, he has been treated with periodic injections in the groin area. These injections cause bruising and he is bedridden for several days following each one. The injections, D.V. stated, affect his ability to sit and lay down for several days after he receives them. However, when questioned by the state, D.V. admitted that the groin pain appellant experienced never prevented him from going to work and did not prevent him from play-fighting with the victim.

D.V. testified that she witnessed appellant and the victim "play[ing] games on each other" involving each pouring cold water on the other while the other was showering. ( *Id.* at 50.) D.V. heard appellant make sexual jokes in front of the victim.

D.V. confirmed that she attended college from 1990 to 1994, and from 1999 to 2003. She attended classes once or twice per week, sometimes in the evenings and sometimes on Saturday mornings. When she was at class appellant would be home alone with the victim. D.V. also confirmed that she and her daughter argued frequently and have never had a good relationship. She stated that appellant was the primary disciplinarian in the household. She also confirmed that her relationship with appellant contained a high degree of tension and stress and the two would argue frequently.

D.V. testified that appellant worked as a weight room supervisor at an athletic club, which sometimes required him to work on weekends. She stated that he also regularly left the house very early on Saturday mornings to attend automobile auctions. She further testified that, for some period of time during the alleged abuse, appellant ran 15 to 18 miles per day. D.V. told the jury that one of the reasons that appellant liked to be naked was because he prided himself on his physique achieved as a result of his exercise regimen.

When asked by defense counsel about arguments she would have with the victim, D.V. told the jury that the victim frequently lied and tried to conceal information, and "had an ongoing problem with behavioral issues, social issues, school, lying. * * * You almost couldn't believe anything she said because she just-either she didn't want to get in trouble, or she just - for her telling the truth was not a natural response when she was asked a question." ( *Id.* at 58.) She

stated that the victim would frequently accuse her of believing appellant and not her daughter, or of choosing him over her daughter. She recalled telling the victim that she was not choosing appellant over the victim, but was choosing truth over a lie.

During her heated arguments with her mother, the victim would call her mother names and threaten to call the police, D.V. recalled. During a family fight that occurred on Valentines Day 2004, the victim threatened to call the police "and said that is not all I will do." (*Id*. at 76.)

D.V. denied ever seeing appellant sexually abuse the victim and said that the victim never told her that appellant had been molesting the victim.

Appellant testified on his own behalf. He testified that he has walked around his home naked "as far back as I can remember," including when he was living with his parents and brother. (*Id*. at 139.) He added that he had been walking around naked at home "all my life." (*Id*.) He admitted walking around the house naked or covered only in a towel when the victim was present. He admitted that "I shouldn't have done it. It was my responsibility to either put clothes on or not come out of the bedroom." (*Id*. at 140.) He admitted that he persisted in this behavior despite his wife's requests that he stop.

Appellant admitted he was home with the victim on Saturday mornings when his wife was at school, from the time the victim was eight years old up until the time when she was 12 years old. However, he denied ever touching the victim in any sexual way, including digitally penetrating her.

He admitted play-fighting with the victim, but stated that he only did so in the nude when, while drying off after a shower or sitting on the couch covered only by a blanket or towel, the victim would instigate the play-fighting by grabbing his towel or blanket and running away with it. He confirmed that sometimes the victim would be naked during their play-fighting. He denied that his naked play-fighting resulted in any body contact other than hitting, although he did admit that he sometimes hit the victim's breast, but, he said, this was purely accidental.

He stated that he would sit on the couch covered only by a towel or blanket because, "my injury, my underclothes or my shorts rubbed directly on the scar where I hurt." (*Id*. at 142.) When asked what

injury he was referring to, he explained that he had had one testicle surgically removed in the year 2000. He stated that, ever since that time, he experiences sharp groin pains every 30 seconds. He has taken Darvocet to alleviate that pain and has also received injections of pain blocks that last from three weeks to three months.

He testified that he worked at Sawmill Athletic Club, and then Westerville Athletic Club, daily from 7:30 a.m. to 4:40 p.m. He also testified that he attended automobile auctions frequently. When he did so, he left the house at 5:45 or 6:00 a.m. He also confirmed that, prior to 2000, he ran for exercise and competed in triathlons.

He testified that when the police initially searched the victim's bedroom, pursuant to his and his wife's consent, the search lasted for two and one-half to three hours. He stated that he believed they had taken "everything out that they wanted" and he did not expect that they would return because they never told him that they were not finished searching for evidence. (*Id.* at 151.)

Appellant told the jury that, approximately three to four weeks after the initial police search of the victim's bedroom, he entered it and found State's Exhibit 5, one of the victim's diaries. He admitted that he read the diary and became angry and tore a page out of it. He stated that he tore out the page because he was angered by an entry calling him a name and stating that he had sexually abused the victim, not because he thought of the page as evidence. He also admitted giving all of the victim's diaries to an attorney (referred to in the presence of the jury only as a "third party") about one week later, but, he said, he did not initially tell the attorney that he had ripped a page out of one of them. He admitted that he left other pages intact that "did not make [the victim] look very good" and that contained the victim's complaints about his rules. (*Id.* at 187.)

Appellant admitted to making sexual jokes in front of the victim, but said he never directed them at her. He confirmed that he had volatile arguments with both his wife and the victim. He admitted that he has a temper.

Appellant testified that there was an incident in which his wife woke up early in the morning and found him in the victim's bed. He stated that his wife asked him why he was there and he told her that he was snuggling with the victim. He admitted that he sleeps in the nude but stated that he was wearing shorts at the time his wife saw him in the

11

victim's bed; he told the jury he remembered he was wearing shorts because he had just come inside from letting the dogs out and retrieving the newspaper. He denied ever being in the victim's bedroom naked, despite admitting that he had been in every other room in the house naked, since he was naked the majority of the time while at home. He stated that he only laid in the victim's bed sometimes in order to play Playstation with her.

*State v. Vance*, 2007 WL 2421822, at *2-9. Petitioner filed a timely appeal, raising the following

assignments of error:

FIRST ASSIGNMENT OF ERROR

The trial court erred when it entered a judgment of conviction despite the fact that the jury's decision was against the manifest weight of the evidence. This error deprived Appellant of his right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section Sixteen of the Ohio Constitution.

SECOND ASSIGNMENT OF ERROR

The trial court deprived Appellant of his state and federal constitutional rights to due process and a fair trial by allowing repeated instances of improper bolstering of the alleged victim's testimony through hearsay of another State's witness and through argument in closing that the alleged victim's story was truthful.

THIRD ASSIGNMENT OF ERROR

The trial court erred when sentencing Appellant to serve consecutive prison terms based on facts not found by the jury or admitted by Appellant, in contravention of the Sixth Amendment to the United States Constitution and the ex post facto clause of the United States Constitution.

FOURTH ASSIGNMENT OF ERROR
The trial court's finding that Appellant is a sexual predator is contrary to the manifest weight of the evidence because the state failed to produce clear and convincing evidence to support such a finding.

FIFTH ASSIGNMENT OF ERROR

> Appellant was deprived of the effective assistance of counsel due to counsel's failure to object to the introduction of improper bolstering evidence and closing argument.

*Id*. at *1-2.  On August 28, 2007, the appellate court affirmed the judgment of the trial court.  *Id*.

On January 23, 2008, the Ohio Supreme Court dismissed Petitioner's appeal.  *State v. Vance,* 116 Ohio St.3d 1478 (2007).

> While defendant's appeal was pending, he filed a petition for post-conviction relief pursuant to R.C. 2953.21. Defendant asserted four grounds for relief: (1) his convictions are against the manifest weight of the evidence; (2) he received ineffective assistance of counsel when counsel failed to object to the prosecution's improperly bolstering evidence; (3) the prosecution engaged in misconduct by repeatedly and improperly bolstering the victim's testimony through hearsay of another witness and in closing argument; and (4) defendant suffered unfair prejudice when the trial court allowed untimely introduction of material evidence during the second and third days of trial, all a result of the prosecution's misconduct. While defendant's petition for post-conviction relief was pending, defendant filed a motion to revise his sentence.

> After the parties briefed the pending petition and motion, the court on March 11, 2010 filed a decision and entry denying both defendant's post-conviction petition and his motion for sentence revision. Noting "[r]es judicata bars any postconviction claim that was or could have been raised * * * on direct appeal," the court concluded each of the claims raised in defendant's post-conviction petition "either was or could have been raised on appeal." The court thus concluded it need not consider any of them. The court nonetheless addressed each of the issues and determined each lacked merit.

> As to defendant's motion to revise sentence, the court noted the limited circumstances in which the court may amend a sentence, such as to correct a void sentence or a clerical mistake. Observing that neither circumstance existed in defendant's case, the court added that the "validity and length of Vance's sentence could have been raised on appeal," meaning "res judicata bars him from raising it" in a post-appeal motion. Moreover, the court noted, "Vance is statutorily ineligible to be judicially released before the end of his stated prison term, even if the court were so inclined. R.C. 2929.20(A)."

*State v. Vance,* 2011 WL 683888, at *1-2 (Ohio App. 10th Dist. Feb. 24, 2011).  Petitioner filed a

timely appeal from those decisions, raising the following assignments of error:

> First Assignment of error:
>
> The eighteen year prison sentence imposed on Petitioner is unreasonable as it placed an unnecessary burden on state or local government resources.
>
> Second Assignment of error:
>
> The eighteen year term of imprisonment imposed was longer than necessary to protect the public by preventing Appellant from re-offending.
>
> Third Assignment of error:
>
> The eighteen year term of imprisonment imposed was longer than necessary to protect the public by incapacitating Appellant.
>
> Fourth Assignment of error:
>
> The costs of incarcerating Appellant makes a prison sentence unduly burdensome on the State of Ohio.

*Id.* at *2.  On February 24, 2011, the appellate court affirmed the judgment of the trial court.  *Id.*

On June 22, 2011, the Ohio Supreme Court dismissed Petitioner's appeal.  *State v. Vance*, 128 Ohio

St.3d 1557 (2011).

On August 18, 2010, Petitioner filed this action pursuant to 28 U.S.C. § 2254.  He alleges

that he is in the custody of the Respondent in violation of the Constitution of the United States based

upon the following grounds:

> 1.  Violation of Sixth Amendment and Ex Post Facto Clause pursuant to *Blakely*. . . imposing consecutive sentence.
>
> 2.  [Denied] due process and fair trial for improper bolstering.
>
> 3.  A Fifth, Fourteenth Amendment violation based on inconsistent

14

jury verdicts.

    4.  Manifest weight.

    5.  Ineffective assistance of counsel.

It is the position of the Respondent that Petitioner's claims are not cognizable in habeas corpus proceedings, are procedurally defaulted or are without merit.

## REQUEST FOR A STAY

Petitioner requests a stay of proceedings so that he may return to the state courts in order to exhaust his claim that he had been improperly convicted on an indictment charging him with "carbon-copy counts" of sexual abuse offenses that constituted allied offenses of similar import and, presumably, violated the Double Jeopardy Clause.  Respondent opposes Petitioner's request.

Where the one-year statute of limitations for filing federal habeas corpus petitions might foreclose the re-filing of a federal  habeas corpus petition after a petitioner exhausts previously unexhausted claims, a court may order a stay of proceedings.  However, such a stay is appropriate. Only where the petitioner can establish both "good cause" for failing to exhaust state court remedies the potential merit of his claims. *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). Here, Petitioner has presented no unexhausted claims for which any state remedies remain available to him.  As discussed *infra*, Petitioner may now no longer present to the state courts a claim that his convictions violate the Double Jeopardy Clause because he failed to raise that claim on direct appeal.

Therefore, Petitioner's request for a stay is **DENIED**.

## REQUEST FOR PRODUCTION OF DOCUMENTS; MOTION TO STRIKE

Petitioner also seeks production of transcripts of pretrial proceedings presided over by Judge Charles Schneider, of sentencing transcripts and of records before the Ohio Supreme Court

Disciplinary Counsel relating to its alleged investigation of Attorney Diane Menashe, Petitioner's defense attorney. Petitioner contends that these documents will assist him in demonstrating that his convictions and sentence are the results of the ineffective assistance of counsel and of manipulation on the parts of Sandra and James Williams, his wife's parents.

Respondent opposes Petitioner's request. Additionally, Respondent has filed a motion to strike from the record the exhibits attached to Petitioner's Reply, Doc. No. 26, in support of his claims. Doc. No. 29.

Although criminal defendants are entitled to a transcript at state expense for use during a direct appeal, there is no constitutional right to a free transcript in connection with a collateral proceeding. *United States v. MacCollom*, 426 U. S. 317 (1976); *Ross v. Moffitt*, 417 U. S. 600 (1974). However, 28 U.S.C. § 2249 requires a respondent in a federal habeas corpus proceeding to file certified copies of "the indictment, plea of petitioner and the judgment, or such of them as may be material to the questions raised, if petitioner fails to attach them to his petition, and same shall be attached to the return to the writ, or to the answer to the order to show cause." *See also* Rule 5(c), Rules Governing Section 2254 Cases in the United States District Courts (". . . The respondent must attach to the answer parts of the transcript that the respondent considers relevant. The judge may order that the respondent furnish other parts of existing transcripts or that parts of untranscribed recordings be transcribed and furnished. . . ."). A trial transcript is usually required when the court considers the merits of a claim challenging the sufficiency of the evidence at trial. 28 U.S.C. § 2254(f); *Nash v. Eberlin*, 437 F.3d 519, 525 (6th Cir. 2006). Moreover, Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts permits a federal court to expand the record to include "additional materials relevant to the determination of the merits of the petition."

Further, under 28 U.S.C. §2250, a clerk of court is required to furnish a petitioner proceeding *in forma pauperis* "certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is pending."

It is clear from the record before this Court that transcripts of Petitioner's trial and sentencing were made available to Petitioner or to his various attorneys.  *See* Exhibits attached to *Return of Writ.*  The transcript of pre-trial proceedings and the records of the Ohio Disciplinary Counsel  – if indeed any exist – are not required for resolution of the claims asserted in this action. Furthermore, it does not appear that these latter documents have been presented to the state courts in support of any of Petitioner's claims.

Petitioner also appears to attempt to expand the record with documents attached to his *Reply*. Specifically, Petitioner submits what appear to be notes of agency interviews of the victim, pages from a book and or magazine purportedly read by the victim and notes purportedly generated by a private investigator.  Petitioner offers these documents in support of his assertions that he is actually innocent of the charges upon which he stands convicted and that he is in fact a victim of a manifest miscarriage of justice.  Petitioner specifically contends that his convictions result from "a pattern of corrupt activity by the prosecutors, the Williams, and their lawyer," and from the false testimony of the victim whose statements against him had been scripted by the mother.  *See Petitioner's Reply*.[1]  Petitioner also asks for an evidentiary hearing so that he may establish these claims.

Rule 7 of the Rules Governing Section 2254 Cases authorizes a court to expand the record with materials relating to the petition:

---

[1] Petitioner has also submitted other documents, including psychological evaluations, a letter sent by a psychologist to Petitioner's former attorney, certain email correspondence and letters written to the trial judge. Respondent does not object to the submission of these documents.

17

> (a) In General. If the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition. The judge may require that these materials be authenticated.
>
> (b) Types of Materials. The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record.
>
> (c) Review by the Opposing Party. The judge must give the party against whom the additional materials are offered an opportunity to admit or deny their correctness.

*Id.* According to the Advisory Committee Notes, the purpose of the rule is not only to enable the court to consider the merits of claims without an evidentiary hearing, but also to assist the court in determining whether an evidentiary hearing is warranted. *See also Blackledge v. Allison,* 431 U.S. 63, 81 (1977). The decision whether to order an expansion of the record under Rule 7 falls within the sound discretion of the District Court. *See Ford v. Seabold,* 841 F.2d 677, 691 (6th Cir.1988).

Where the state courts have adjudicated a claim on the merits, however, a federal court's review in habeas corpus proceedings is ordinarily limited to the record presented to the state courts. *See* 28 U.S.C. §2254(e)(2); *Cullen v. Pinholster*, ––– U.S. –––, 131 S.Ct. 1388, 1398 (2011); *see also Holland v. Jackson*, 542 U.S. 649, 652 (2004) ("[W]hether a state court's decision was unreasonable must be assessed in light of the record the court had before it"); *Sheppard v. Bagley*, – F.3d –, 2011 WL 4031097, at *3 (6th Cir. Sept. 13, 2011)(refusing to consider evidence not considered by the state courts in view of *Pinholster*). The United States Supreme Court has explained the reasoning behind this limitation:

> Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§ 2254(d)(1) and

18

(e)(2) ensure that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Id.*, at 437, 529 U.S. 420, 120 S.Ct. 1479; *see also Richter*, 562 U.S., at ——, 131 S.Ct., at 787 ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").

*Pinholster,* at 1401.

A federal habeas petitioner who has failed to develop the factual basis for his claim in the state courts may not obtain an evidentiary hearing on that claim in federal habeas corpus proceedings unless he can establish that his claim relies on:

(I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "Diligence for purposes of [§ 2254(e)(2) ] depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend ... upon whether those efforts could have been successful." *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

Petitioner in this case has never presented a claim of actual innocence to the state courts. Moreover, because the documents by which Petitioner seeks to expand the record appear to have

been available prior to trial, it cannot be said that Petitioner acted diligently in obtaining and utilizing those documents in the state courts.  In any event, the United States Supreme Court has held that a free standing claim of actual innocence is not appropriate for federal habeas corpus review. *Herrera v. Collins*, 506 U.S. 390, 400 (1993)("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").[2]

> *See also  Wright v. Stegall*, No. 05-2419, 2007 WL 2566047, *2-3 (6th Cir. Sept.5, 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent").  In any event, none of these documents tend to establish Petitioner's actual innocence of the charges upon which he stands convicted, nor do they serve as even a gateway claim of actual innocence sufficient to justify a merits review of otherwise procedurally defaulted claims.

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at 316.  Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327.

---

[2]It remains unresolved whether an inmate sentenced to death may maintain a free standing claim for habeas relief based on actual innocence. *See In re Davis*, --- U.S. ----, 130 S.Ct. 1 (2009).

> The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

*Souter v. Jones,* 395 F.3d 577, 589-90 (6th Cir. 2005)(footnote omitted). Petitioner has failed to meet this standard here.

In view of the foregoing, Respondent's motion to strike, Doc. No. 29, is **GRANTED**. Petitioner's motion for production of documents, Doc. No. 25, is **DENIED**. Petitioner's request for an evidentiary hearing is likewise **DENIED.**

## CLAIM FOUR

Petitioner acknowledges that claim four, in which he contends that his convictions were against the manifest weight of the evidence, is not cognizable in these proceedings. *See Petitioner's Reply,* Doc. 126.

The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect

to issues of conflicting testimony, weight of the evidence and credibility of witnesses. *Jackson*, 443 U.S. at 319; *Walker*, 703 F.2d at 969.

However, under Ohio law, a claim that a verdict is against the manifest weight of the evidence - as opposed to one based upon insufficient evidence - requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence and consider the credibility of witnesses in order to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that a petitioner's conviction was against the manifest weight of the evidence cannot be considered in a federal habeas proceeding.

In short, claim four fails to provide a basis for federal habeas corpus relief.

### PROCEDURAL DEFAULT AND CLAIM FIVE

Respondent contends that claims two and three, as asserted by Petitioner in this action, have been procedurally defaulted.  In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to fairly present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6 (1982) (*per curiam); Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived

22

them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by a petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir.1985).

In claim two, Petitioner alleges that he was denied a fair trial due to the admission of testimony by a social worker regarding statements allegedly made by the victim and comments by the prosecutor that the victim required counseling for sexual abuse. Petitioner raised these claims on direct appeal; however, the state appellate court reviewed the claims only for plain error because of Petitioner's failure to object at trial:

[A]ppellant contends that the trial court erred in admitting social worker Clark's testimony about what the victim told her about appellant's sexual abuse, and in allowing the prosecution to state, in its closing argument, that "it is important to remember [the victim is] still in counseling today, further emphasizing her credibility. She testified that, yes, she is still in counseling." (Vol. III Tr. 44.) FN1

FN1. In his brief under this assignment, he also argues that the trial court erred in allowing the victim to testify that she was "in counseling." However, he has not separately stated an assignment of error with respect to this alleged error, as required by App.R. 16(A)(3). Pursuant to App.R.12(A)(1)(b), this court is required to determine the appeal based on the assignments of error set forth in the briefs. *In re Brown*, Franklin App. No. 03AP-1205, 2005-Ohio-2425, ¶ 11; see, also, *In re Estate of Taris*, Franklin App. No. 04AP-1264, 2005-Ohio-1516, ¶ 5. For these reasons, we decline to address the argument concerning the victim's testimony about counseling.

Appellee argues initially that appellant failed to object at trial to Clark's testimony about her interview with the victim, thereby waiving all but plain error as to that issue. Appellant disagrees, pointing out that he raised the issue in a pretrial motion *in limine*, which the trial court denied. He argues, with no citation to authority, that the ruling was "final, and therefore plain error analysis does not apply." FN2

FN2. *Reply Brief*, 4.

"As related to trial, a motion *in limine* is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury." *Woods v. Columbus* (1985), 23 Ohio App.3d 163, 164, 23 OBR 406, 492 N.E.2d 466, quoting *State v. Spahr* (1976), 47 Ohio App.2d 221, 1 O.O.3d 289, 353 N.E.2d 624, paragraph one of the syllabus. "There is no provision under the rules or the statutes for a motion *in limine*. The request was no more and no less than an appeal to the trial court for a precautionary instruction to opposing counsel to avoid error or prejudice, such instruction to be effective until admissibility was resolved. Such a request lies in the inherent power and discretion of the trial judge to control the proceedings." *Spahr, supra,* at 224, 353 N.E.2d 624.

"A motion *in limine* requires a two-step procedure: first, a pretrial consideration as to whether any reference to the area in question should be precluded until admissibility can be ascertained during trial; and, second, during the trial when the party desires to introduce the evidence which is the subject of the motion *in limine*, a determination by the trial court as to the admissibility of the evidence, which is determined by the circumstances and evidence adduced in the trial and the issues raised by the evidence." *Riverside Methodist Hosp. Assn. v. Guthrie* (1982), 3 Ohio App.3d 308, 3 OBR 355, 444 N.E.2d 1358, syllabus.

As such, the ruling on a motion *in limine* does not preserve the record on appeal and an appellate court need not review the propriety of such an order unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial. *Gable v. Village of Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 35. As the court in *Gable* noted, the federal counterpart to Evid.R. 103 was amended in 2000 to provide that a definitive pretrial ruling on the record admitting or excluding evidence obviates the need for a party to renew an objection or offer of proof at trial to preserve a claim of error for appeal. However, the court also noted that Ohio's rule has not been so amended. Ohio Evid.R. 103 continues to provide:

Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected, and * * * [a] timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context * * *.

Therefore, when the trial court denied appellant's motion *in limine*, which sought to exclude Clark's testimony about the victim's statements, the ruling was not final and appellant was required to renew his objection to the evidence at trial in order to preserve the issue for appeal. Because he did not, we review only for plain error. Likewise, appellant did not object to appellee's statement in closing argument related to the victim being in counseling, so plain error guides our analysis of this issue as well. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 49.

According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's

decision to correct an error despite the absence of a timely objection at trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The *Barnes* court went on to explain:

First, there must be an error, *i.e*., a deviation from a legal rule. *State v. Hill* (2001), 92 Ohio St.3d 191, 200, 749 N.E.2d 274, 283 (observing that the "first condition to be met in noticing plain error is that there must be error"), citing *United States v. Olano* (1993), 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b] ). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. *State v. Sanders* (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, 111, citing *State v. Keith* (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47, 54; *see, also, Olano*, 507 U.S. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519 (a plain error under Fed.R.Crim.P. 52[b] is " 'clear' or, equivalently, 'obvious' " under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. *See, e.g.*, *Hill,* 92 Ohio St.3d at 205, 749 N.E.2d at 286; *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

*Ibid*.

The *Barnes* court further stated: "[E]ven if a forfeited error satisfies [the above noted] three prongs [of the plain error doctrine], * * * Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them." *Ibid.* In the context of a criminal case, a reviewing court should invoke the plain error doctrine with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Jenks* (1991), 61 Ohio St.3d 259, 282, 574 N.E.2d 492; *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Thus, plain error does not exist unless, but for the error, the outcome of the proceeding would have been different. *Jenks* at 282, 574 N.E.2d 492.

The trial court committed no error in the admission of Clark's testimony regarding the victim's statements made during the medical forensic interview at the Center for Child and Family Advocacy. As

26

we have previously held, "[t]he [hearsay] exception set forth in Evid.R. 803(4) extends to statements made to social workers as long as the purpose of the statement is part of initiation of medical diagnosis or treatment." *State v. Jordan*, Franklin App. No. 06AP-96, 2006-Ohio-6224, ¶ 20, citing *State v. Nasser*, Franklin App. No. 02AP-1112, 2003-Ohio-5947, ¶ 52. "Statements made by a child identifying the perpetrator of sexual abuse may be pertinent to both diagnosis and treatment, because such statements will assist medical personnel in treating any actual injury and in assessing the emotional and psychological impact of the abuse to formulate a counseling plan or other treatment therefor." *Ibid.*, citing *State v. Dever* (1992), 64 Ohio St.3d 401, 413, 596 N.E.2d 436.FN3 Finding no error, plain or otherwise, we overrule appellant's second assignment of error as it relates to Clark's testimony.

FN3. *See*, also, *State v. Boyer*, Franklin App. No. 06AP-05, 2006-Ohio-6992, ¶ 18 (defendant's right to due process and right to confront witnesses under the Sixth Amendment to the United States Constitution and the Tenth Amendment to the Ohio Constitution were not violated by admission of the victim's and her mother's statements in a medical forensic interview summary prepared during the victim's assessment at Children's Hospital, where both declarants testified at trial and were therefore subject to cross-examination).

*State v. Vance,* 2007 WL 2421822, at *11-13.  The United States Court of Appeals for the Sixth Circuit has held that an Ohio court's plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir.2000).  Moreover, Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that forecloses federal review unless the petitioner establishes cause for the waiver and resulting prejudice. *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004).

In claim three, Petitioner asserts that he was convicted on "inconsistent jury verdicts." *Petition,* at 8.[3]  Petitioner failed to raise this claim in the Ohio courts.  Further, Petitioner may now

---

[3] Petitioner asserts:

[The] jury verdict was the product of a[n] emotional, irrational response.  The trial court commented "that it was a close call to dismiss the GSI charges."  The

no longer present such a claim to the state courts under Ohio's doctrine of *res judicata*.  Moreover, the United States Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata* is an adequate ground for denying federal habeas relief.  *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998).  Further, the doctrine of *res judicata* is stated in unmistakable terms in countless Ohio decisions, and Ohio courts have consistently refused to review the merits of claims in reliance on that doctrine.  *See State v. Perry*, 10 Ohio St.2d 175 (1967);  *State v. Cole*, 2 Ohio St.3d 112 (1982);  *State v. Ishmail*, 67 Ohio St.2d 16 (1981).

In short, Petitioner has waived claims two and three for federal habeas corpus review.  He may still obtain review of the merits of these claims if he establishes cause for his procedural default and actual prejudice resulting from the claimed constitutional violations.  As cause for his procedural default of claim two, the Court presumes that Petitioner intends to assert the ineffective assistance of counsel – an issue presented by Petitioner in his claim five.

The ineffective assistance of counsel may constitute cause for a petitioner's procedural default so long as such a claim has been presented to the state courts and is not, itself, procedurally defaulted.  *Edwards v. Carpenter,* 529 U.S. 446, 452-53 (2000).  Here, the state appellate court rejected Petitioner's claim of ineffective assistance of trial counsel in relevant part as follows:

> [A]ppellant argues that he was deprived of the effective assistance of counsel as a result of his trial counsel's failure to object at trial to the introduction of Clark's testimony about the victim's statements during

---

jury verdict pursuant to the Fifth and Fourteenth Amendments should have been reversed.

*Id*.  Petitioner also states, "Ground Three is conceded until and if the this Court grants an evidentiary hearing to frame the legal issues and make factual determinations."  *Reply*, at 6.  Because it is unclear whether Petitioner intends to withdraw claim three, the Court will addresses that claim.  To the extent that Petitioner also asserts in claim three an additional argument that his convictions are against the manifest weight of the evidence, the Court concludes that – for the reasons stated *supra*, such a claim does not offer federal habeas relief.

her assessment interview at Children's Hospital Center for Child and Family Advocacy. Appellant also argues that his counsel was ineffective for failing to object to the portion of appellee's closing argument in which appellee attempted to bolster the victim's credibility by reminding the jury that the victim was in counseling. We will discuss each claimed instance of ineffective assistance of counsel in turn.

To prove ineffective assistance of counsel, defendant must show that counsel's performance was deficient. *Strickland v. Washington* (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment to the United States Constitution. *Ibid.*

The defendant must then show that counsel's deficient performance prejudiced his defense. *Ibid.* The accused must demonstrate a reasonable probability that a different verdict would have been returned but for counsel's deficiencies. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. *Ibid.*

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *Id.* at 697.

"Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. A properly licensed attorney is presumed competent, and the burden of proving ineffectiveness is on the defendant. *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. Thus, counsel's actions that "might be considered sound trial strategy" are presumed effective. *Strickland, supra*, at 689. Furthermore, counsel need not raise meritless issues. *State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068.

We have already determined that Clark's testimony regarding the victim's statements was admissible. Therefore, appellant's trial counsel made no error in failing to object to it at trial. As for the failure to object to appellee's argument, in closing, that the victim's credibility is enhanced by the fact that she is still in counseling, we

29

observe that:

> [A] reasonable attorney may decide not to interrupt his opponent's closing argument. *State v. Keene* (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246. Objections can " 'disrupt the flow of a trial' " and " 'are considered technical and bothersome by the factfinder.'" *State v. Campbell* (1994), 69 Ohio St.3d 38, 53, 630 N.E.2d 339, quoting *Jacobs*, Ohio Evidence (1989) iii-iv. A decision not to interrupt during closing arguments reflects an "objective standard of reasonable representation." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
>
> *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 154, certiorari denied, *Myers v. Ohio*, 539 U.S. 906, 123 S.Ct. 2254, 156 L.Ed.2d 116.
>
> We, too, conclude that counsel's failure to object to appellee's closing argument was a reasonable strategy, especially considering there was abundant other evidence before the jury bearing upon the issue of the credibility of the victim.

*State v. Vance,* 2007 WL 24218212, at *22-23.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1). Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d). The United States Court of Appeals for the Sixth Circuit has summarized this standard as follows:

> Under the "contrary to" clause [of §2254(d)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the

30

> state court identifies the correct legal principle from the Supreme
> Court's decisions but unreasonably applies it to the facts of the
> petitioner's case.

*Boykin v. Webb,* 541 F.3d 638, 642 (6th Cir.2008) (quoting *Williams v. Taylor,* 529 U.S. 362).

Petitioner has failed to meet this standard here.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must
> show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687; *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id*., at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 697. Because a petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if a court determines that a petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697.

31

The state appellate court in Petitioner's case determined that the testimony of the social worker regarding the victim's statements were admissible under Ohio law.  Therefore, Petitioner has failed to establish the ineffective assistance of counsel on this basis.  Similarly, for the reasons addressed by the state appellate court, and because Petitioner cannot establish prejudice as that term is defined under *Strickland*, his counsel's failure to object to the prosecutor's statements in closing argument, did not amount to the ineffective assistance of counsel.

Claim five is therefore without merit.

It follows that Petitioner has failed to establish cause for his procedural default of claims two and three.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333.  As previously discussed, Petitioner argues that he is actually innocent of the charges and a victim of a manifest miscarriage of justice.  He also specifically contends that the charges against him were the result of manipulation by the victim's grandmother, who is psychologically unstable, who had previously made false allegations against him and who had sought, unsuccessfully, to obtain custody of the child.  Petitioner also charges that this grandmother harassed Petitioner and the mother of the victim.  He also alleges that an earlier indictment against him was dismissed but then re-filed before a different trial judge.  *See Traverse*.  However, in the view of this Court, the record fails to demonstrate that Petitioner is actually innocent of the charges upon which he stands convicted so as to justify a merits review of his otherwise procedurally defaulted claims.

In short, claims two and three are procedurally defaulted.  Claim five is without merit.

32

## CLAIM ONE

In claim one, Petitioner alleges that the retroactive application in his case of *State v. Foster*, 109 Ohio St.3d 1 (2006), violated the Ex Post Facto Clause and denied him due process. Petitioner also argues that the trial court abused its discretion when it imposed an unreasonable sentence. The state appellate court rejected this claim as follows:

> [A]ppellant argues that the imposition of consecutive terms violates his constitutional rights. Specifically, he contends that the remedy the Supreme Court of Ohio imposed in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, to address the unconstitutional aspects of Ohio's sentencing scheme violates his constitutional rights under both the Due Process and Ex Post Facto Clauses of the United States Constitution and comparable provisions of the Ohio Constitution. *Foster* was decided after appellant committed the crimes for which he was convicted, but before he was sentenced for same.

> "In *Foster*, the Ohio Supreme Court held that under the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, portions of Ohio's sentencing scheme were unconstitutional because they required judicial fact finding before a defendant could be sentenced to more than the minimum sentence, the maximum sentence, and/or consecutive sentences." *State v. Houston*, Franklin App. No. 06AP-662, 2007-Ohio-423, ¶ 30, citing *Foste*r, supra, at paragraph one of the syllabus. To remedy the situation, "the Ohio Supreme Court severed the offending sections from Ohio's sentencing code. Thus, pursuant to *Foster,* trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive or more than minimum sentences." Id. at ¶ 3, 845 N.E.2d 470, citing *Foster*, at ¶ 100.

> In *Houston* we concluded that the *Foster* severance remedy does not violate a defendant's due process rights and right to be free from ex post facto laws because defendant "had notice 'of the potential sentences at the time they committed their crimes, and because the remedial holding of *Foster* was not unexpected[.]' " *State v. Lariva*, Franklin App. No. 06AP-758, 2007-Ohio-1012, ¶ 11, citing *Houston,*

at ¶ 4.

*State v. Vance*, 2007 WL 2421822, at *14.[4]  Petitioner's claim is plainly without merit.

In *Hooks v. Sheets*, 603 F.3d 316 (6th Cir. 2010), the United States Court of Appeals for the Sixth Circuit rejected the argument now presented by petitioner, at least as it applies to the imposition of consecutive terms of incarceration:

> The Ex Post Facto Clause prohibits a state from passing a law that (1) criminalizes an action done before the law was passed, which was innocent when done, (2) " 'aggravates a crime, or makes it greater than it was, when committed,' " (3) " 'changes the punishment' " to inflict greater punishment than the law provided when the crime was committed, or (4) " 'alters the legal rules of evidence' " so that less or different testimony is required than at the time the offense was committed. *Rogers v. Tennessee*, 532 U.S. 451, 456, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001) (quoting *Calder v. Bull*, 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798)). The Ex Post Facto Clause, however, provides by its terms that it is applicable only to acts of the Legislature, and " 'does not of its own force apply to the Judicial Branch of government.' " *Id*. (quoting *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)). Nevertheless, the "limitations on ex post facto judicial decisionmaking are inherent in the notion of due process." *Id*. Consequently, the principles of the Ex Post Facto Clause apply to the courts through the Due Process Clause. *See id*. at 457. Because these principles are viewed through the lens of due process in the judicial context, the constitutionality of judicial action turns on the traditional due process principles of "notice, foreseeability, and, in particular, the right to fair warning," rather than the specific prescriptions of the Ex Post Facto Clause. *Id*. at 458-59.

---

[4] Petitioner also argued, in the state appellate court, that the trial court had abused its discretion, under Ohio law, in sentencing him.  This claim presents an issue of state law and is not appropriate for federal habeas corpus review.  A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States.  28 U.S.C. §2254(a).  A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law."  *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988).  Similarly, a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).  " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition.  *Id*.  (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Only where the error resulted in the denial of fundamental fairness will habeas relief be granted.  *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).  Such are not the circumstances here.

2:10-cv-00746-ALM-NMK Doc #: 31 Filed: 11/03/11 Page: 35 of 38  PAGEID #: 1532

A state's statutory scheme does not violate the Sixth Amendment simply because it constrains the ability of courts to impose consecutive sentences to situations in which the court has found specific facts. *Oregon v. Ice,* 555 U.S. 160, ----, 129 S.Ct. 711, 714-15, 172 L.Ed.2d 517 (2009). Instead, a state may allow courts unfettered discretion to impose consecutive sentences or it may limit that authority without violating the Sixth Amendment. *Id.* At the time Hooks committed his crimes, Ohio permitted the court to impose consecutive rather than concurrent sentences if it found particular facts, *see* ORC § 2929.14(E)(4), and explained its "reasons for imposing the consecutive sentences," ORC § 2929.19(B)(2)(c). The Ohio Supreme Court nevertheless determined that these statutory provisions violated *Blakely* because they allowed the imposition of longer sentences - consecutive sentences - based upon judicial factfinding. *Foster*, 845 N.E.2d at 491.

Regardless of the court's determination in *Foster*, the maximum sentence to which Hooks was constitutionally subject contemplated consecutive sentences. Hooks would have the court calculate his maximum sentence as being imposed concurrently based solely on the facts found by a jury at the time of sentencing, because he argues that this calculation is mandated by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). However, *Apprendi* does not limit the calculation of Hooks's potential sentence to concurrent sentences when the judicial fact-finding here is allowed under *Ice*. Thus, Hooks was initially and constitutionally subject to consecutive sentences according to the "guided discretion" of the court. *See Foster*, 845 N.E.2d at 495. Moreover, Hooks was always aware of the potential for consecutive sentences. On re-sentencing post-*Foster* he remained subject to consecutive sentences within the discretion of the court. Since Hooks was always subject to consecutive rather than concurrent sentences in the discretion of the trial court, his re-sentencing under *Foster* did not raise ex post facto or due process concerns. We need not reach the broader question of whether re-sentencing under *Foster* ever violates the Due Process or Ex Post Facto Clauses because *Foster's* application in Hooks's case does not do so.

*Id.,* at 320-21. Further, Petitioner's argument has been repeatedly rejected by state and federal courts,

including this Court. *Smith v. Brunsman*, 626 F.Supp.2d 786, 793-95 (S.D. Ohio 2009) (referring

to numerous cases rejecting the same claim raised by Petitioner herein).

35

Petitioner faced the same sentencing range both prior to and after *Foster*. The trial court's imposition of non-minimum, consecutive terms of incarceration after *Foster* did not violate the Due Process or Ex Post Facto Clauses.

Claim one is without merit.

**WHEREUPON**,  it is **ORDERED** that Respondent's motion to strike, Doc. No. 29, is **GRANTED.**  Petitioner's request for an evidentiary hearing, motion to stay, Doc. No. 24, and motion for production of documents, Doc. No. 25, are **DENIED**.

It is **RECOMMENDED** that this action be **DISMISSED**.  It is **SPECIFICALLY RECOMMENDED** that Petitioner's claims two and three be dismissed as procedurally defaulted and that claims one, four and five be dismissed as without merit.

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation*

will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 *s/ Norah McCann King*
Norah McCann King
United    States    Magistrate    Judge

November 3, 2011